UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X       <u>For Online Publication Only</u>
SUSAN PIETRI,


                                  Plaintiff,

                                                                     **<u>MEMORANDUM & ORDER</u>**
                   -against-                                         14-CV-3506 (JMA) (ARL)


ELC MANAGEMENT, LLC,

                                  Defendant.
-------------------------------------------------------------X

**APPEARANCES:**

Russell Platzek
The Law Office of Steven A. Morelli, P.C.
1461 Franklin Avenue
Garden City, NY 11530
           *Attorney for Plaintiff*

Barbara M. Roth, Esq.
David J. Baron, Esq.
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
           *Attorney for Defendant*

**FILED
CLERK**

8/9/2016 11:48 am

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

Plaintiff Susan Pietri ("Pietri") brings this action against her former employer, defendant

ELC Management, LLC ("ELC"), alleging claims for age discrimination under the Age

Discrimination and Employment Act (the "ADEA"), 29 U.S.C. §§ 631 <u>et seq</u>., and New York State

Executive Law ("NYSHRL") §§ 290 <u>et seq</u>.  ELC has moved for summary judgment on all claims.

For the reasons stated below, defendant's motion for summary judgment is granted, and plaintiff's

claims are dismissed.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted.

In 2014, Pietri, then fifty-two years old, filed this suit against defendant ELC, her former employer, alleging that ELC discriminated against her based on her age by terminating her from employment. (Compl. ¶¶ 3, 7, 27, ECF No. 1.) ELC, more widely known as Estée Lauder, is a global manufacturer and marketer of skin care, makeup, fragrance, and hair care products. (Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 2, ECF No. 27-3.) In February 2003, ELC hired Pietri as a Customer Service Coordinator in Melville, New York, to support the Clinique brand. (Id. ¶ 13.) Pietri was over forty when ELC hired her. (Id. ¶ 14.)

## A. ELC's Customer Service Department and Its Employees

Throughout Pietri's employment with ELC, the Customer Service Department worked closely with department stores and retail beauty stores that ordered ELC's products. (Id. ¶ 4.) The Customer Service Department included three teams: (1) Field Support, (2) Launch and Promotions, and (3) Master Data. (Id. ¶ 5.) Pietri worked on the Field Support team, which communicated with the retailers and other field sales employees and managed the retailers' orders. (Id. ¶¶ 6–8.)

The Field Support team was comprised of fifteen employees. (Id. ¶ 64.) Pietri's allegations of differential treatment focus on two women in particular: Jacqueline Goldfine ("Goldfine") and Stephanie Yost ("Yost"). (Pl.'s Rule 56.1 Counter-Statement ("Pl.'s 56.1") ¶ 112, ECF No. 27-36.) Both Goldfine and Yost were in their twenties when Pietri worked at ELC. (Pl.'s 56.1 ¶¶ 113–14.) Goldfine and Yost each worked in Field Support with Pietri for a period of time between 2010 and 2013. (Pl.'s 56.1 ¶ 115; Reply Decl. of Laura Profeta ("Profeta Reply Decl.") ¶ 7, ECF No. 27-57.) Goldfine joined Field Support in 2010 and was promoted to Launch and Promotions

in 2012.  (Pl.'s 56.1 ¶ 115; Profeta Reply Decl. ¶ 5.)  Yost was hired in Field Support in 2011 and later obtained a position in Brand Supply during ELC's 2013 restructuring, which is discussed below in greater detail.  (Profeta Reply Decl. ¶¶ 7–9.)  Generally, Pietri states that Goldfine and Yost were substandard employees who often made errors that supervisors attributed to Pietri.  (Decl. of Susan Pietri ("Pietri Decl.") ¶¶ 18–20, 26, ECF No. 27-50.)  Pietri alleges that Goldfine and Yost were able to avoid termination because of their ages.  (Compl. ¶¶ 17, 20, 25–27.)  These points are discussed in greater detail further below.

Pietri's direct manager was Pat Schnettler, a Customer Service Manager.  (Def.'s 56.1 ¶ 17.)  Pietri was also supervised by Laura Profeta, Executive Director of Customer Service.  (Id. ¶ 18.)  Both Schnettler and Profeta are approximately one to two years older than Pietri.  (Id. ¶¶ 17–18.)  Both were responsible for evaluating Pietri's performance.  (Id. ¶ 21.)  John Sands, Vice President of the North American Customer Service and Order Management, headed the Customer Service Department from 2008 until Pietri's departure, and is approximately eight years older than Pietri.  (Id. ¶¶ 11–12.)  Sands made the decision to terminate Pietri in 2013.  (Id. ¶¶ 76, 94.)

## B.  Pietri's Performance at ELC

Pietri's performance as a Customer Service Coordinator was satisfactory in her early years at ELC.  (Pl.'s 56.1 ¶¶ 126–33.)  From 2003 to 2009, her annual ratings ranged from "Exceptional," to "Exceeds Requirements," to "Proficient."  (See generally Performance Reviews from 2003 to 2009, Ex. Nos. 2–9 to Platzek Decl., ECF Nos. 27-39–46.)  In January 2009, ELC promoted Pietri to Field Support Administrator for the Clinique brand.  (Def.'s 56.1 ¶ 15.)  Pietri's main job functions were assisting with the management of orders and shipments and addressing questions raised by the retailers and field sales employees.  (Id. ¶ 16.)

According to Pietri's managers, however, Pietri's performance began to decline in 2011.

(Id. ¶ 22.)    In February of that year, Profeta assigned some new accounts to Pietri. (Pl.'s 56.1 ¶ 22a.)  Given Pietri's tenure with the company, Profeta expected Pietri to be able to accommodate the new accounts with ease, but, according to Profeta, Pietri struggled immediately. (Def.'s 56.1 ¶ 22.)  Profeta received negative feedback about Pietri, documented in various emails addressed to Profeta, from the Distribution and Transportation teams, the field sales force, and other ELC employees.  (Pl.'s 56.1 ¶ 23; Decl. of Laura Profeta ("Profeta Decl.") ¶¶ 8–9, ECF No. 27-14; see Complaint Emails, Ex. I to Profeta Decl., ECF No. 27-23.)  Profeta asserts that when she addressed the complaints with Pietri, Pietri blamed others and made excuses for her behavior. (Def.'s 56.1 ¶ 24.)  Pietri acknowledges that she discussed complaints about her performance with Profeta, but denies that she responded in this manner.  (Pl.'s 56.1 ¶ 24b.)  Pietri testified that the new accounts were problematic because she had not been given the information necessary to handle the workload posed by the new accounts.  (Dep. of Susan Pietri ("Pietri Dep.") 28–30, Ex. No. 1 to Platzek Decl., ECF No. 27-38.)  There is no specific evidence in the record as to other employees' accounts or workloads.

From 2011 through the end of Pietri's employment with ELC, Profeta and Schnettler issued a series of negative performance reviews, which criticized Pietri for, inter alia, her lack of communication skills, her inability to manage basic daily tasks, her unprofessional demeanor, and her passive approach to problem solving.  (Pl.'s 56.1 ¶¶ 25–33, 35–44, 46–49, 51; April 2011 Work Performance Overview, Ex. B to Profeta Decl., ECF No. 27-16.)  Pietri acknowledges that she received the negative reviews and discussed them with her managers.  (Pl.'s 56.1 ¶¶ 25–41, 47–49.)  In response to these negative reviews, however, Pietri generally testified that Schnettler and Profeta were "unfairly" critical.  (Pietri Dep. 30.)

For example, during May 2011, Profeta and Schnettler prepared Pietri's Annual Performance

review, and gave Pietri the second-lowest rating: "Makes A Contribution." (Pl.'s 56.1 ¶ 29a.) ELC's standard procedure dictates that such a rating be reported to Human Resources and that the subject employee be placed on a Development Action Plan. (Id.) Later that month, Profeta issued Pietri a Development Action Plan (the "Plan"), which noted that although Pietri's performance had improved somewhat, she continued to provide inconsistent feedback to customers and tended to "complicate the tasks she [was] asked to complete." (Id. ¶ 32a; May 2011 Development Action Plan (the "Plan"), Ex. D to Profeta Decl., ECF No. 27-18.) In accordance with ELC procedure, Pietri's standard annual merit increases were frozen while she remained on the Plan. (Pl.'s 56.1 ¶ 43.)

In Pietri's comments to the Plan, she admitted to some of the cited behaviors, but attempted to justify her conduct by citing general weaknesses that "hinder[ed] all of customer service," and by noting that she was "consistently concerned with improving procedures and documentation." (Plan.) For example, Pietri agreed that she "felt pressured into answering demands too quickly" and that she gave "too much information at times," which may have "confuse[d] email recipient[s]." (Id.) However, she suggested that, inter alia, "[l]ack of information provided to [her] on original account take over caused an extreme handicap" to her performance. (Id.)

As an employee on the Plan, Pietri was subject to more frequent evaluations, conducted by Profeta and Schnettler, which were consistently negative. (Pl.'s 56.1 ¶¶ 35–40; October 2011 Performance Review, Ex. E to Profeta Decl., ECF No. 27-19; October 2011 Development Action Plan, Ex. F to Profeta Decl., ECF No. 27-20.)

In December 2011, ELC Management and Human Resources issued Pietri a final formal warning, stating that her performance still failed to "meet expectations" and was "adversely affecting the needs of [her] department." (Final Formal Warning, Ex. G to Profeta Decl., ECF No.

27-21.)  The warning advised Pietri that her failure to improve could result in disciplinary action, up to and including termination.  (Pl.'s 56.1 ¶ 41.)

During January 2012, Pietri and Profeta met with Gina Kwarta of ELC Management and Human Resources to discuss Pietri's Plan.  (Id. ¶ 43.)  At the meeting, Pietri again conceded that certain "criticisms of her performance insecurities were valid."  (Id. ¶ 44.)  Profeta, however, agreed to remove Pietri from the Plan, in what Profeta describes as an attempt to encourage her. (Id. ¶ 43; Def.'s 56.1 ¶ 43.)  Because she was removed from the Plan, Pietri received her standard annual merit increase.  (Pl.'s 56.1 ¶ 43.)

Profeta asserts that after the January 2012 meeting, Pietri's performance and demeanor continued to stagnate.  (Def.'s 56.1 ¶ 45.)  Pietri generally disputes that there were issues with her performance and demeanor by explaining that she had a history of positive performance, while Schnettler and Profeta were critical of Pietri but not of other employees who made errors. (Pl.'s 56.1 ¶ 45; Pietri Dep. 8, 30, 76.)  In May 2012, Profeta gave a Pietri a "Commendable" rating in her Annual Performance Review—one level up from her May 2011 "Makes A Contribution" rating.  (Def.'s 56.1 ¶ 46.)  Profeta insists that she gave Pietri the "Commendable" rating only to encourage her.  (Id.)  Plaintiff, however, maintains that she earned this rating.  (Pl.'s 56.1 ¶ 46b.) In any event, despite the slightly increased rating, Profeta's review still reiterated the same criticisms about Pietri's performance as earlier reviews.  (Id. ¶ 47.)  Profeta informed Pietri that her job would be at risk if she did not improve.  (Id. ¶ 49.)

The field sales force complained frequently about Pietri's performance throughout 2012 and into 2013.  (Id. ¶ 51; Complaint Emails.)  For example, from late 2012 into early 2013, Clinique operations executives exchanged a series of emails with Pietri over confusion regarding placement and shipment of orders, and then emailed Profeta to complain about Pietri's miscommunications.

(Complaint Emails.)  Pietri admits that the field sales force did not like her, but claims that such dislike arose because Schnettler often blamed Pietri for the Field Support team's errors, forcing Pietri to offer clumsy explanations.  (Pl.'s 56.1 ¶ 51; Pietri Dep. 76–77.)  Specifically, Pietri testified—without much particularity—that she was reluctant to disclose to the field sales force that she was "dealing with a bunch of incompetence [sic]," including "Jackie and her group," so she continued to "give them excuses," which made Pietri "sound like a complete idiot[.]"  (Pietri Dep. 76.)

Pietri claims that Schnettler treated her badly "because [Pietri] came in knowing [Pietri's] immediate director, Kathleen Andrews, and [Schnettler] did not like [Andrews] . . . ."  (Pl.'s 56.1 ¶ 53; Pietri Dep. 62–63.)  Pietri described ELC to her colleagues as "hell on earth," and did not like her managers, who were aware that she felt this way.  (Pl.'s 56.1 ¶ 52; Pietri Dep. 122–23.)

## C.  ELC's 2013 Field Support Reorganization

In February 2013, ELC decided to transfer the entire Field Support function from Melville, New York, to its Northtec Facilities in Bristol, Pennsylvania ("Northtec").  (Pl.'s 56.1 ¶ 60.)  This was part of an ongoing operational program, known as "Strategic Modernization Initiative" or "SMI," which ELC had started in 2005.  Because ELC's Distribution and Transportation groups were already based at Northtec, both Sands and external consultants hired by ELC agreed it would be more efficient from a business perspective to place Field Support there as well.  (Id. ¶¶ 61–62; Def.'s 56.1 ¶¶ 61–62.)

Shortly thereafter, also as part of SMI, ELC decided to eliminate all the Field Support positions, which were held by Pietri and fourteen others, and to establish new Order Management Specialist ("OMS") and Manager positions.  (Pl.'s 56.1 ¶ 64.)  The OMS role was at least one

grade level higher than the Field Support Administrator role, and required increased qualifications, including, inter alia: the ability to adapt to new applications; familiarity with "SAP," a new software program; strong communication and problem-solving skills; advanced Excel skills; a good understanding of transaction flow; and demonstrated abilities to build positive working relationships and work efficiently.  (Id. ¶ 65; Decl. of John Sands ("Sands Decl.") ¶ 22, ECF No. 27-24; Field Support Administrator Job Description, Ex. A to Sands Decl., ECF No. 27-25; Order Management Specialist Job Description, Ex. B to Sands Decl., ECF No. 27-26.)  Pietri acknowledges that the OMS role was "enhanced" compared to her Field Support Administrator role. (Pl.'s 56.1 ¶ 67; Pietri Dep. 45.)

Sands announced ELC's decision to eliminate the Field Support team in March 2013. (Pl.'s 56.1 ¶ 70.)  The Clinique team, which included Pietri, would be eliminated in the first phase, at the end of June 2013.  (Id. ¶ 69.)  In total, fifteen Field Support employees were affected by the decision, including Pietri.  (Id. ¶ 71.)  Sands explained to the Field Support team that the new OMS role would require increased competencies and technical skills, and that any employees interested in relocating would be considered if they met those elevated qualifications.  (Id. ¶¶ 71–72.)  ELC gave the Field Support employees first priority to apply for OMS positions.  (Id. ¶ 72.)  Sands told the Field Support team that any employees who were not interested in, or not selected for, the OMS role in Pennsylvania could "pursue other opportunities in the company" or would "receive a separation package consistent with [ELC's] fair company practice."  (Id. ¶ 73; Customer Service Restructure Script, Ex. C to Sands Decl., ECF No. 27-27.)  Sands also noted that the Launch and Promotions and Master Data teams would remain in Melville.  (Pl.'s 56.1 ¶ 73.)

**D. Pietri's Application for the OMS Position**

After the restructuring was announced, ELC distributed a "Job Interest Form" to each of the fifteen Field Support employees to gauge their interest in applying for the OMS role at Northtec. (Id. ¶ 74.) Four employees indicated interest: Pietri, Schnettler, Debbie Stettinger, and John Cammarata. (Id.) Around April 2013, these four employees were invited to interview with Sands, the sole decision-maker for OMS hiring, and Sean Skolnick, Director of Customer Service at Northtec. (Id. ¶ 75–76.) The outcomes of their applications are as follows.

Stettinger, age fifty-one at the time, withdrew her application shortly into her interview with Sands because she was no longer interested in relocating. (Id. ¶¶ 74, 77.) Stettinger did not apply for any other position at ELC, and her employment was terminated when her position was eliminated. (Id. ¶ 79.)

Cammarata, age twenty-eight at the time, interviewed with both Sands and Skolnick, but Sands rejected him for the role. (Id. ¶ 81.) Cammarata applied for other positions at ELC, but did not receive any offers. (Id. ¶ 82.) Cammarata's employment was terminated when his position was eliminated. (Id.)

Schnettler, age fifty-three at the time, was the Field Support manager. (Id. ¶¶ 74, 83.) She interviewed with Sands and Skolnick for a newly established manager position at Northtec. (Id. ¶¶ 74, 83.) Schnettler was invited back for a second interview, but declined. (Id. ¶ 84.) Sands asked Schnettler to remain at ELC for the transition period, and Schnettler agreed to do so. (Id. ¶ 85.) Schnettler held this interim role until about May 2014, when Profeta and Sands offered her a permanent position in Melville on the Event Management team, which she accepted. (Id. ¶ 86.)

Pietri, age fifty-two at the time, also interviewed for the OMS role. (Id. ¶¶ 74, 88.) Sands

maintains that, in order to determine Pietri's qualifications, he asked her the same questions he had prepared and asked the other applicants. (Id. ¶ 88.) According to Sands, Pietri explained her documented performance issues by complaining about her accounts and arguing that her assignments were unfair. (Id.) In his written notes from the interview, Sands observed that Pietri had "no understanding of basics" and "little to say about improvements to work." (Id. ¶ 89; Sands Interview Notes, Ex. G to Sands Decl., ECF No. 27-31.) He also noted that Pietri described herself as "intermediate" with Excel, admitted that she used Excel infrequently, and professed that she did not "work with formulas." (Pl.'s 56.1 ¶ 89.) According to Sands, Pietri was "combative" and "in denial" about her performance issues. (Id.) Pietri generally disputes that Sands's notes from the interview accurately described her work performance and explains that any negative reviews of her performance were inaccurate, as summarized further below. (Id.) Pietri, however, could not recall all the details of her interview with Sands. (Id. ¶ 90; Pietri Dep. 74–75.) Pietri maintains that her interview with Sands proved unsuccessful because he "attacked [her] for not knowing" a technical budget term and told her that "the field didn't like [her]" and that she "wasn't qualified for the position." (Pl.'s 56.1 ¶ 90; Pietri Dep. 75.)

Pietri then interviewed with Skolnick. (Pl.'s 56.1 ¶ 91.) Skolnick, too, was unimpressed; his written notes from the interview focus on Pietri's negativity and failure to articulate why she was more qualified than other applicants for the position. (Id.) Pietri admits to a few of Skolnick's criticisms, but maintains that her interview with Skolnick did not go well because he called her by the wrong name and suggested that she was not well-liked. (Id. ¶ 92; Pietri Dep. 84–85, 94–95.)

Sands deemed Pietri unqualified for the OMS position based on her poor interviews and history of performance issues. (Sands Decl. ¶ 42.) He informed her that she lacked the professional and interpersonal "skills and capabilities" they were seeking for the role.

(Pl.'s 56.1 ¶ 94; Sands Rejection Script to Pietri, Ex. H to Sands Decl., ECF No. 27-32.) Pietri did not apply for any other position at ELC, and her employment was terminated when her position was eliminated in June 2013. (Pl.'s 56.1 ¶¶ 96–97.)

According to Pietri, a "culture" existed at ELC that generally "preferred younger employees over older employees," which affected how Sands and Skolnick perceived her during her interviews. (Pietri Decl. ¶¶ 6, 9.)

## II. DISCUSSION

Pietri claims that she was terminated because ELC discriminated against her based on her age and alleges discrimination based on both a disparate treatment theory and a disparate impact theory. ELC argues that Pietri cannot establish a claim under either theory.[1] For the reasons that follow, I find that Pietri has failed to establish a claim for age discrimination. ELC's motion for summary judgment is therefore granted.

## A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a

---

[1] ELC also argues that Pietri did not satisfy her duty to mitigate damages. Because I am granting ELC summary judgment on all of plaintiff's claims, it is unnecessary to address defendant's argument about mitigating damages.

verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). The non-moving party must produce "significant probative evidence" demonstrating that a factual dispute does in fact exist, otherwise summary judgment is appropriate. Anderson, 477 U.S. at 249.

In a discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer . . . ." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Because direct evidence of discriminatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Id. However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (alteration in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.

1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

## B. **Standard for Disparate Treatment Claims Under the ADEA and NYSHRL**

Pietri alleges that ELC discriminated against her in violation of the ADEA and NYSHRL based on her age. For these claims, I apply the three-step analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973), and its progeny. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–10 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–54 (1981).

Under this framework: (1) a plaintiff must first establish a prima facie case of discrimination; (2) then, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action; and (3) finally, if the employer articulates such a reason, the burden shifts back to plaintiff to prove, by a preponderance of evidence, that the employer's stated reason is merely pretextual, and that discrimination was the actual reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802–05; Burdine, 450 U.S. at 253; Ruiz v. Cnty. Of Rockland, 609 F.3d 486, 491–92 (2d Cir. 2010); Russell v. Cnty. of Nassau, 696 F. Supp. 2d 213, 231 (E.D.N.Y. 2010). "Evidence of pretext, however, even combined with the minimal showing necessary to establish a prima facie case . . . does not mandate a denial of summary judgment." Lizardo v. Denny's, Inc., 270 F.3d 94, 103 (2d Cir. 2001) (citation omitted). Rather, the court "examine[s] the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Id. at 101 (quoting Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000)).

To establish a prima facie case of age discrimination, the plaintiff must show that: (1) she belonged to a protected age group; (2) she was qualified for the position at issue; (3) she suffered

an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. Abdu-Brisson, 239 F. 3d at 466.

The plaintiff's burden of proof is de minimis at the prima facie stage of her case. Weinstock, 224 F.3d at 42. Discriminatory intent underlying a decision may be inferred from the "totality of the circumstances," including the decision's historical background, the sequence of events, and a decision-maker's contemporaneous statements. Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 49 (2d Cir. 2002), superseded by statute on other grounds, ADA Amendments of 2008, Pub. L. No. 110–325, 122 Stat. 3553. However, "conclusory allegations of discrimination, absent any concrete particulars, are insufficient." Cameron v. Cmty. Aid For Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003) (quoting Meiri, 759 F.2d at 998) (internal quotation marks omitted).

Once the plaintiff has established her prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its action. McDonnell Douglas, 411 U.S. at 802; see also Delaney, 766 F.3d at 168; Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010). Once the employer satisfies that burden, "the presumption of discrimination raised by the prima facie case 'simply drops out of the picture.'" Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134–35 (2d Cir. 2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 510–11).

At the third stage of the McDonnell Douglas analysis, "the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr., 509 U.S. at 515. If plaintiff fails to "show that there

is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004), superseded by statute on other grounds, Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071, amending 42 U.S.C. § 1981. Ultimately, in an ADEA suit, the plaintiff must prove that her age was the "but for" cause of the adverse action, which "'is not equivalent to a requirement that age was the [defendant's] only consideration, but rather that the adverse employment action[ ] would not have occurred without it.'"[2] Delaney v. Bank of Am. Corp., 766 F.3d 163, 169 (2d Cir. 2014) (alteration in original) (quoting Fagan v. U.S. Carpet Installation, Inc., 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011)). The trial court examines an employer's decision only for discrimination; it does "not sit as a super-personnel department that reexamines an entity's business decisions." Delaney, 766 F.3d at 169 (quoting Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997)).

## C. Analysis of Disparate Treatment Claim

For Pietri's disparate treatment claim, ELC argues that Pietri has not established a prima facie case of age discrimination and that, even if she had, she cannot prove that ELC's legitimate, nondiscriminatory reasons were a pretext for discrimination. It is undisputed that Pietri has satisfied two elements of her prima facie case: she was over forty, which places her within the protected age group, and she was denied an OMS position and terminated, thereby suffering adverse employment actions. However, ELC contends that Pietri cannot demonstrate that she was

---

[2] "The Second Circuit has 'assumed, without deciding, that the ADEA's "but for" standard of causation also applies to age discrimination claims brought under the NYSHRL,' [but has noted] that 'New York courts have yet to rule definitively on this issue.'" Cappelli v. Jack Resnick & Sons, Inc., No. 13-CV-3481, 2016 WL 958642, at *7 (S.D.N.Y. Mar. 8, 2016) (quoting Mikinberg v. Bemis Co., 555 Fed. App'x 34, 35 (2d Cir. 2014)). I assume, arguendo, that the more forgiving "motivating factor" standard of causation applies to plaintiff's NYSHRL claim. However, for the reasons stated infra, even under that causation standard, Pietri's evidence is still insufficient to defeat summary judgment.

qualified for the OMS position or that she was terminated under circumstances giving rise to an inference of discrimination.

As explained below, I agree that Pietri cannot establish a prima facie case. And, even if she could meet her initial burden of raising an inference of discrimination, no reasonable jury could conclude, based on the record here, that ELC's legitimate, nondiscriminatory reasons were a pretext for age discrimination.

### 1. Pietri's Prima Facie Case

ELC argues that Pietri cannot show that she was terminated under circumstances giving rise to an inference of discrimination.[3] ELC further argues that any inference of discrimination is weakened because Pietri was over forty when ELC first hired her, and Sands, who decided to terminate her employment, is eight years older than her.

Pietri argues that ELC's treatment of two of her younger coworkers, Goldfine and Yost, supports an inference of discrimination in several ways. First, Pietri maintains that Goldfine and Yost misbehaved and made errors, but that managers failed to discipline them and would, instead, blame these errors on Pietri. Second, Pietri argues that Goldfine avoided termination because she received certain training that ELC denied to Pietri. Finally, Pietri contends that Yost avoided termination by obtaining another position at the company that ELC did not post online. I find that Pietri has failed to establish the inference of discrimination element of her prima facie case.

As a threshold matter, when ELC hired Pietri in 2003, she was already over the age of forty. The "inference of discrimination is much weaker where the plaintiff employee is well within the protected class when first hired." James v. New York Racing Ass'n, 76 F. Supp. 2d 250, 255 (E.D.N.Y. 1999), aff'd, 233 F.3d 149 (2d Cir. 2000). Furthermore, Sands, the sole decision-maker

---

[3] ELC also argues that Pietri has not made out her prima facie case because she was not qualified for the OMS position. I address Pietri's qualifications further below, in the context of pretext.

with respect to Pietri's employment, is eight years older than Pietri, and a "well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class." Drummond v. IPC Int'l, Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005).

There is no inference of discrimination because Pietri has failed to show that Goldfine and Yost were similarly situated. A plaintiff can raise an inference of discrimination by showing that her employer subjected her to differential treatment compared to other, similarly situated employees outside of her protected class. Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). Plaintiff must demonstrate that the employees in question are similarly situated in "all material respects," i.e., they were "subject to the same performance evaluation and discipline standards" for "engag[ing] in comparable conduct." Ruiz, 609 F.3d at 494. Whether the compared employees report to the same supervisor is also relevant. Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." Mandell, 316 F.3d at 379. "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Associates v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

*i. The Allegedly Preferential Treatment of Goldfine and Yost*

First, Pietri maintains that Field Support supervisors treated her differently than her younger colleagues, Goldfine and Yost. According to Pietri, Goldfine and Yost broke department rules and made errors that Pietri had to correct. (Pl.'s 56.1 ¶¶ 112, 116–117, 124.) Specifically, Pietri observed that Goldfine was rarely punctual and performed personal tasks during work hours, and that Schnettler ignored this behavior. (Pl.'s 56.1 ¶¶ 116, 118.) Pietri also maintains that Yost

made errors, including during coverage for Pietri, which Pietri had to correct.[4]  (Pl.'s 56.1 ¶ 124.)

However, employees are only similarly situated if they engaged in comparable conduct.  Pietri's

performance issues from 2011 to 2013—which were substantiated by her colleagues' continuous

complaints and involved fundamental difficulties with communication, task management, and

professionalism—are not comparable to the vaguely described faults that Pietri observed in

Goldfine and Yost.  See DeFina v. Meenan Oil Co., 924 F. Supp. 2d 423, 434 (E.D.N.Y. 2013)

(finding no issues of fact as to differential treatment where alleged comparator receives fewer

complaints or where the plaintiff's infractions are objectively more serious than the alleged

comparator's infractions).  Pietri has not shown that she was similarly situated to Goldfine or Yost.

Therefore, even if ELC handled Pietri's performance issues differently than the conduct and errors

of Goldfine and Yost, that is insufficient to give rise to an inference of discrimination.

### ii. Pietri's Allegations as to Goldfine

Next, according to Pietri, Goldfine was protected from termination in 2013 because she

received special training to become an SAP "Trainer" or "Power User."  (Pietri Decl. ¶ 24.)

Although Pietri expressed interest in becoming a Power User, she asserts that ELC never

interviewed her for the role and never followed up on other customer service employees' interest

in becoming a Power User either.  (Pl.'s 56.1 ¶¶ 120–21; Pietri Dep. 15–16.)  Plaintiff maintains

that, "[i]nstead, Goldfine was given the position."  (Pl.'s 56.1 ¶ 121; Pietri Dep. 15–16.)  In

response, ELC argues that whether an individual was a Power User was irrelevant to continued

---

[4]  Generally, plaintiff does not provide specific details about the instances in which Goldfine and Yost made errors. Pietri provides one example, in which she claims that when Yost covered for Pietri during a vacation, Yost made numerous errors that Pietri had to correct.  (Pietri Decl. ¶ 26.)  However, Pietri neither elaborates on these errors nor describes whether her managers knew about them.  (Id.)

employment at ELC and that Goldfine was not selected to become a Power User "instead' of Pietri.[5]

Specifically, ELC contends that Goldfine avoided termination because she moved to Launch and Promotions in 2012, prior to ELC's decision to restructure its branches as part of SMI—not because she was a Power User.[6]  (Def.'s Rule 56.1 Reply Statement ("Def.'s Reply 56.1") ¶ 122, ECF No. 27-52; Pietri Dep. 16; Profeta Reply Decl. ¶ 5.)  Pietri concedes that Goldfine was on the Launch and Promotions team when Power Users were selected and that the 2013 elimination of Field Support did not affect the Launch and Promotions team.  (Pietri Dep. 16–17; Pietri Decl. ¶ 24.)  Additionally, ELC denies that it treated Pietri any differently when she was not selected to become a Power User.  ELC argues that no one on the Field Support team was made a Power User and that Goldfine, who was not on Pietri's team, was not made a Power User "instead" of Pietri.  (Def.'s Reply 56.1 ¶¶ 120–21.)  Moreover, when Pietri expressed interest in becoming a Power User in response to an email from Profeta, Profeta explicitly noted in that email "we already have representation for Launch/Promo.  We need Power Users for the Field Support Administrator roles."  (Email dated Jan. 30, 2013, Ex. 12 to Platzek Decl., ECF No. 27-49.)

Although Pietri contends that Goldfine remained employed at ELC because Goldfine became a Power User, she has failed to indicate any issue of material fact on this point.  First, Pietri concedes that Goldfine had previously secured a position in Launch and Promotions, a team

---

[5] In its Reply 56.1 Statement, ELC describes that a "Power User" was not an actual position but a term for those who were selected to be temporarily removed from their duties to receive SAP training.  (Def.'s Reply 56.1 Statement ("Def.'s Reply 56.1") ¶ 119, ECF No. 27-52.)  Defendant further describes that no employee interested in becoming a Power User was ever interviewed; selection was instead based on manager recommendations, and Pietri was not recommended by her manager.  (Id. ¶ 120.)  However, to the extent that these statements are not supported by admissible evidence in the record, they are not accepted as undisputed facts.

[6] According to ELC, Goldfine's demonstrated abilities would have been valuable to the Launch and Promotions team as early as 2010, but because there were no openings in Launch and Promotions at that time, Goldfine held a temporary role in Field Support until a position in Launch and Promotions became available in 2012.  (Profeta Reply Decl. ¶ 4.)

unaffected by the subsequent 2013 restructuring.  In contrast, the entire Field Support team, including Pietri, was eliminated as part of the restructuring.  Moreover, despite Pietri's contention that Goldfine became a Power User instead of Pietri, there is no evidence that Goldfine was similarly situated to Pietri when they were on different teams.  Profeta's email regarding Power Users explicitly stated "Launch/Promo" or the Launch and Promotions team already had Power Users and solicited interested individuals from the Field Support team.  Pietri also does not identify who was responsible for selecting any of the Power Users.  However, even if Schnettler or Profeta had selected the Power Users, neither manager took part in denying Pietri the OMS opportunity or eliminating her Field Support position.  Sands alone made those decisions.  Put simply, Pietri has not drawn a connection between her failure to become a Power User and her inability to retain employment at ELC.  Therefore, I find any perceived factual dispute surrounding the relevance of the Power User role immaterial and insufficient to defeat summary judgment.

### iii. Pietri's Allegations as to Yost

Third, Pietri argues that an inference of discrimination arises because Yost was able to avoid termination by securing a different position—a position that Pietri contends was never posted online for applications.  According to Pietri, ELC's alleged failure to post this position raises an inference of discrimination.  This argument is flawed in two respects.  Most importantly, Pietri cannot establish that the position was never posted.

It is undisputed that Yost secured a position as a Branded Supply Manager at ELC's Melville location shortly after Sands announced that the Field Support function would be eliminated.  (Profeta Reply Decl. ¶¶ 8–9; Def.'s 56.1 ¶ 70.)  Pietri argues that this position was never posted on ELC's internal website; however, the evidence in the record—including Pietri's own deposition testimony—does not support Pietri's assertion.  According to Pietri's testimony,

Yost told her "the job was posted and [Yost] applied for it." (Pietri Dep. 18.) Pietri then "tried to search for the posting"—at some unspecified time after the posting had been filled— because she thought ELC's internal career site "usually" went back "a few weeks." (Id.) Because she was ultimately unable to find the posting online, she believed that it had never been posted.[7] (Id.) This testimony, however, is sheer speculation, and Pietri does not offer any other evidence to support her allegation that the Branded Supply Manager position was not posted online.[8] Moreover, ELC has produced a screenshot of Yost's application from her career site profile, which shows that Yost applied for the position online on March 25, 2013. (Def.'s Reply 56.1 ¶ 125; Reply Decl. of Barbara M. Roth ("Roth Reply Decl.") ¶ 4, ECF No. 27-53; Yost Branded Supply Manager Job Submission, Ex. C to Roth Reply Decl., ECF No. 27-56.)

Not only has Pietri failed to introduce evidence that the Branded Supply Manager position was not posted online, but to the extent that Pietri is attempting to allege a failure-to-promote claim concerning the Branded Supply Manager position, that argument fails as well. Pietri does not allege that she would have applied for this position had she known about it or that she would have been qualified for it. See Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000) (providing that to establish a prima facie case for a failure-to-promote claim, the plaintiff must show she applied for the position and that she was qualified for it). In fact, Pietri testified that she did not apply for any position at ELC, other than the OMS role, because she did not consider herself qualified for other positions she saw posted. (Pietri Dep. 21.) Absent allegations that she applied and was qualified for the position, Pietri's claim that Yost received preferential treatment

---

[7] Pietri claims to have kept a printout from her search of ELC's internal career site, showing that the Branded Supply Manager position was never posted. (See Def.'s Reply Mem. at 7 n.2, ECF No. 27-51.) Despite requests from defense counsel, she has not produced it. (Id.)

[8] The record contains no evidence about how ELC posts jobs or how long jobs remain posted after they are filled.

with respect to the Branded Supply Manager position fails. Finally, even assuming Pietri had met her initial burden, she has failed to demonstrate that ELC's proffered reasons were a pretext for age discrimination, as discussed further below.

### 2. ELC's Legitimate, Nondiscriminatory Reasons

Even assuming that Pietri could establish a prima facie case of disparate treatment, ELC has offered legitimate, nondiscriminatory reasons for its decisions to: (1) terminate her as a Field Support Administrator; and (2) reject her for the OMS role.

First, according to ELC, Pietri's employment ended when the entire Field Support team was cut as part of SMI restructuring. Sands, in conjunction with external business consultants, recommended that Field Support be relocated to ELC's Northtec facilities, where the Distribution and Transportation teams were already based, to encourage partnership among these three essential cogs in the Customer Service wheel.

Second, ELC contends that Sands rejected plaintiff for the OMS position because that position required skills beyond those necessary for Pietri's Field Support Administrator role, Pietri had a documented history of performance issues, and she had interviewed poorly.

### 3. Pretext

Because ELC has tendered legitimate, nondiscriminatory reasons for its decisions regarding Pietri's employment, the burden shifts to Pietri to offer evidence from which a "reasonable jury could conclude by a preponderance of the evidence" that Pietri's age was the "but for" cause of those decisions. Gorzynski, 596 F.3d at 107. Pietri argues that ELC discriminated against her because of her age, contending that: (1) her negative performance reviews were inaccurate, and she had received positive reviews in previous years; (2) there is a question of material fact as to whether she was qualified for the OMS role; (3) her supervisors favored

Goldfine and Yost because of their ages; and (4) ELC upper management generally preferred younger employees. The support Pietri offers for these arguments, however, is insufficient to raise a genuine issue of material fact as to whether ELC's proffered reasons were a pretext for age discrimination.

### i. Pietri's Allegedly Inaccurate Performance Reviews

Pietri generally disputes the accuracy of her negative reviews and points to the good reviews she had received in the past. This evidence is insufficient to show pretext.

Critically, a substantial portion of the criticism levelled at Pietri was based on complaints about Pietri's performance from the Distribution and Transportation teams, the field sales force, and other ELC employees. Pietri admits that these coworkers did not like her, but offers no evidence that her age was the reason for that dislike. Pietri attempts to address these complaints by claiming that, inter alia, the new workload she received in 2011 was too challenging because the additional accounts were transferred to her without adequate information. Pietri also claims that other employees' incompetence led to her errors, and Schnettler would unfairly attribute any mistakes or confusion to Pietri. Plaintiff's excuses and attempts to justify these complaints are insufficient to raise a factual issue as to pretext. There is no evidence in the record that the workload from Pietri's accounts was more challenging or greater than that of similarly situated employees. Pietri's attempts to blame her problems on the accounts' initial transfer rings hollow when the complaints about her continued long after the transfer had occurred. Furthermore, Pietri's testimony that Schnettler unfairly blamed Pietri for other employee's errors does nothing more than allege that other employees constantly caused confusion, without identifying specific instances.

Similarly, plaintiff's other attacks on her negative performance reviews essentially boil down to: (1) attempts to excuse and justify her poor performance; (2) conclusory assertions that are consistently devoid of any specifics; (3) plaintiff's subjective disagreement with her manager's evaluations of her performance; and (4) references to prior good reviews. None of this evidence suggests pretext.

Plaintiff contends that her previous positive reviews as well as the uptick in her 2012 evaluation show that her negative reviews were unjustified and a pretext for discrimination. However, a claim of "good performance evaluations in the past does not demonstrate that [an employee's] final performance reviews were unjustified." Hirschberg v. Bank of Am., N.A., 754 F. Supp. 2d 500, 518 (E.D.N.Y. 2010). Moreover, the record here undermines Pietri's arguments that her positive reviews show pretext.

Pietri's managers did note an improvement in her performance in 2012—the year before she was terminated—when they removed her from the development plan, reinstated her annual merit increase, and gave her a higher performance rating. Even accepting that those recognitions were warranted, however, Pietri's 2012 review was still generally negative. Moreover, after this review, field sales employees continued to complain about Pietri, from at least October 2012 through March 2013. In short, Pietri's 2012 uptick does not undermine her poor performance as a legitimate reason behind ELC's decisions to terminate her and deny her the OMS opportunity.

Pietri also points to her early stint of good performance at ELC. These previous good reviews do not prove that her subsequent negative reviews were unjustified. See Hirschberg, 754 F. Supp. 2d at 518; cf. Delaney v. Bank of Am. Corp., 908 F. Supp. 2d 498, 512 (S.D.N.Y. 2012) (finding that a positive review of plaintiff's performance the year before he received a negative review did not prove that the negative review was unwarranted, especially when the employee's

group, duties, and manager had changed), aff'd, 766 F.3d 163 (2d Cir. 2014). Pietri's consistent stream of positive reviews all occurred prior to 2011, at which time she was assigned the additional accounts. Thereafter, the record demonstrates that Pietri's supervisors received numerous complaints about Pietri's performance. Pietri has failed to demonstrate that her negative reviews were unwarranted.

Most importantly, Pietri fails to show that her age played any role in her supervisors' assessments of her work. McCarthy v. New York City Tech. Coll. of City Univ. of New York, 202 F.3d 161, 165 (2d Cir. 2000) (noting that a plaintiff cannot establish discrimination based on age without asserting specific facts to support such a claim). Even if an employee believes that she was unfairly targeted and that her negative reviews were unwarranted, she must put forth some evidence to show that this alleged targeting was based on her age. See Nicholls v. Philips Semiconductor Mfg., 760 F. Supp. 2d 407, 420 (S.D.N.Y. 2011); see also Robinson v. Zurich N. Am. Ins. Co., 892 F. Supp. 2d 409, 430 (E.D.N.Y. 2012) (finding that an employee's disagreement with her employer's evaluations of her performance cannot, without more, show that her employer's proffered reason for termination was pretextual); Hirschberg, 754 F. Supp. 2d at 518. Critically, Pietri herself claimed that Schnettler, her manager, treated her poorly because of office politics. Pietri testified that Schnettler did not like her because Pietri had a working relationship with a director, Kathleen Andrews, whom Schnettler disliked. Therefore, Pietri's contentions that her poor performance reviews were at all linked to her age are unpersuasive.

*ii. Pietri's Allegations About the OMS Role's Qualifications*

Second, Pietri argues that there is a genuine issue of material fact as to whether she was qualified for the OMS role, but her supporting evidence fails to show that ELC's reasons for rejecting her for the position were pretextual.

Whether an applicant is qualified for particular employment depends on the criteria the employer specifies for the position. See Hirschberg, 754 F. Supp. 2d at 514. While an employer may evaluate job applicants using subjective standards, and may exercise "unfettered discretion" in selecting among those qualified, "an employer may not use wholly subjective and unarticulated standards . . . ." Byrnie v. Town of Cromwell Bd. of Educ., 243 F. 3d 93, 103–04 (2d Cir. 2001) (quoting Knight v. Nassau Cnty. Civil Serv. Comm'n, 649 F.2d 157, 161 (2d Cir. 1981)). Rather, an employer's reasons for its hiring decisions must be "clear and specific." Id. at 105 (quoting Meiri, 759 F.2d at 997) (internal quotation marks omitted).

Here, Pietri contends that the OMS qualifications were too subjective. The OMS job description called for, inter alia, strong communication and problem-solving capabilities, advanced Excel skills, and the ability to build positive working relationships. Contrary to Pietri's argument, these standards are neither "wholly subjective" nor "unarticulated." See Byrnie, 243 F.3d at 104.

Moreover, the record is replete with evidence showing how Pietri fell short of these criteria. According to her managers' comments in her performance reviews from 2011 to 2013, she struggled to communicate effectively, could not manage basic responsibilities, and behaved unprofessionally. Pietri's colleagues also complained to her managers about her lack of communication and task management skills. These weaknesses squarely conflicted with the qualifications sought for the OMS role. Furthermore, Pietri admitted during her interviews— which she concedes did not go well—that she used Excel infrequently, despite the call for advanced skills. Considering Pietri's shortcomings, Sands's decision to reject her for the OMS role demonstrates neither unfairness nor discrimination. Byrnie, 243 F.3d at 105 (noting that where employer's proffered reason "is reasonably attributable to an honest even though partially

subjective [employee] evaluation," it is not discriminatory (internal citations and quotations omitted)). Accordingly, Pietri has failed to establish that ELC's decision not to offer her the OMS position was discriminatory.

### iii. The Allegedly Favorable Treatment of Goldfine and Yost

Pietri argues that two younger employees, Goldfine and Yost, enjoyed preferential treatment from supervisors and that this evidence supports her claim that ELC's reasons for denying her the OMS position and terminating her were a pretext for age discrimination. As discussed in the context of Pietri's prima facie case, however, Pietri fails to show that she was similarly situated to Goldfine or Yost. Moreover, even assuming Pietri's evidence about Goldfine and Yost could raise an inference of discrimination, Pietri's claim would still fail because she cannot demonstrate that ELC's proffered reasons were pretextual.

Pietri's emphasis on Goldfine and Yost is particularly misplaced because the more appropriate comparators for Pietri were Cammarata and Schnettler, two other Field Support employees who also applied for OMS positions. Cammarata, age twenty-eight, was rejected for the OMS role and ultimately let go, while Schnettler—who is a year older than Pietri—was offered a second interview for an OMS Manager position and retained employment at ELC. These hiring decisions hardly support Pietri's contention that ELC considered age when judging candidates for the OMS opportunities. See Cabrera v. New York City, 436 F. Supp. 2d 635, 645 (S.D.N.Y. 2006) (dismissing plaintiff's discrimination claim where others hired were, like plaintiff, over fifty years old).

### iv. The Alleged "Culture" of Age Discrimination at ELC

Finally, Pietri suggests that a culture of partiality toward younger employees pervaded ELC upper management and impacted employment decisions. However, this claim is wholly devoid of

evidentiary support. Where an employer has produced "convincing evidence" to defend its actions, and the plaintiff's response "consists of purely conclusory allegations of discrimination," summary judgment is proper. <u>Walder v. White Plains Bd. of Educ.</u>, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010). Here, Pietri offers only her own beliefs to support her vague assertion that ELC generally preferred younger employees. This approach does not present a genuine issue of material fact for trial. <u>See</u> <u>Cameron</u>, 335 F.3d at 63. Accordingly, plaintiff's disparate treatment claim is dismissed.

**D. <u>Disparate Impact Claim</u>**

Pietri also alleges that the 2013 restructuring had a disparate impact on her and other older employees. ELC argues that Pietri has produced no statistical evidence to support this claim. Moreover, she has failed to defend this theory at all in her opposition papers.

Under the disparate impact theory, an employee can raise an inference of discrimination by showing "that a facially neutral employment policy or practice has a significant disparate impact" on members of a protected group. <u>Byrnie</u>, 243 F. 3d at 111. To establish a <u>prima facie</u> disparate impact case, a plaintiff must: "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." <u>Chin v. Port Auth. of N.Y. & N.J.</u>, 685 F.3d 135, 151 (2d Cir. 2012) (internal quotation marks and citations omitted). Statistical evidence is critical to such a case, and must reflect a disparity substantial enough to suggest causation when considered with other evidence. <u>Malave v. Potter</u>, 320 F.3d 321, 326 (2d Cir. 2003). The "plaintiff's statistical evidence must reflect a disparity so great that it cannot be accounted for by chance." <u>United States v. City of New York</u>, 637 F. Supp. 2d 77, 86 (E.D.N.Y. 2009) (quoting <u>E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.</u>, 186 F.3d 110, 117 (2d Cir. 1999)) (internal quotation marks omitted).

Pietri's disparate impact claims fails. Most importantly, Pietri has abandoned this claim; she never addresses disparate impact in her opposition papers. Regardless, Pietri has failed to produce evidence, statistical or otherwise, that demonstrates an age disparity among employees who remained at ELC after the restructuring. On the contrary, the record shows that a younger employee, Cammarata, was also rejected for the OMS role, whereas an older employee, Schnettler, received a second interview and remained at ELC. Although Pietri compares her circumstances to those of Goldfine and Yost, for the reasons explained earlier, these two employees held positions unaffected by the restructuring. Thus, Pietri's disparate impact claim fails.

### III. CONCLUSION

I have considered plaintiff's remaining arguments and find them meritless. For the reasons set forth above, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly and close the case.

Dated: August 9, 2016
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE